UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JULIO CESAR BONILLA,

              Petitioner,

    v.

SHAWN HATTON, Warden,

              Respondent.

No.  1:13-cv-01710-LJO-SKO  HC

**FINDINGS AND RECOMMENDATION THAT COURT DENY PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Julio Cesar Bonilla[1] is a state prisoner proceeding *pro se* with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. As grounds for habeas relief, Petitioner alleges that (1) admission of his statement to detectives violated *Miranda*;[2] (2) Petitioner invoked his right to counsel; (3) admission of Petitioner's statement was prejudicial; (4) failure to instruct the jury on lesser included offenses violated Petitioner's right to due process; (5 and 6) the trial court had a duty to instruct the jury, on the trial court's own motion, on voluntary and involuntary manslaughter; (7) insufficient evidence supported the murder conviction; (8) insufficient evidence supported the second degree murder conviction; (9) the prosecution withheld exculpatory evidence; (10) the prosecution presented false evidence; (11) the prosecution deprived Petitioner of his property without due process; (12) appellate counsel provided ineffective assistance; and (13) appellate counsel prejudiced Petitioner.  Having

---

[1] Petitioner is also known as Julio Cesar Guevara.
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the petition.

## I.     Factual Background

### A.     The Investigation

On September 29, 2009, Melissa Franks, a mail carrier, notified Merced Animal Control that the dogs on the property at 440 E. Mission Avenue in an unincorporated area of Merced County appeared malnourished and appeared not to have been cared for. Franks had also noticed that the gate to the property was uncharacteristically locked and that mail was not being retrieved from the mailbox.

Although the area of the property was rural, and empty acreage stretched behind it, the house was not secluded. A neighbor's house was directly across the street, and another house could be seen across the pasture. A residential development was nearby.

Three Animal Control officers investigated the following day, accompanied by Merced County Sheriffs Department Deputy Joe Lara. Lara testified that the gate was locked, and a small friendly dog was just inside the gate. An animal control officer cut the lock and collected five malnourished dogs. Lara went to the house but was unable to make contact with anyone inside. Upon entering the unlocked front door, Lara saw that a large living room chair was on its side. Three bedrooms were adjacent to each other on one side of the house. The master bedroom was at the front, a middle bedroom appeared to have been occupied, and the rear bedroom was used as an office. The bedrooms appeared to have been ransacked. The bathroom was full of dead flies. Beyond the bathroom, in a room with a water heater and laundry machines,[3] were two decomposing bodies, carefully arranged with one lying on top of and perpendicular to the other. The top body, later identified as 81-year-old William Cisneros, was not covered. The bottom

---

[3] Petitioner referred to this room as the "boiler room."

2

body, later identified as William's wife, 45-year-old Maria Clara "Clara" Cisneros, had been covered with a blanket and a towel.

Interviews with family members and neighbors revealed that William and Clara Cisneros lived at 440 E. Mission Avenue with Clara's cousin Julio.  Relatives gave investigators cell phone numbers for William and Clara.

At trial, William's brother, Lucio Cisneros, testified that William had lived in the home for many years, originally with his first wife Emily.  Some time after Emily's death, William married Clara.  Until her death, their mother had lived in a smaller house on the right hand side of the property (the "casita"), alone at first and later with Lucio and William's sister, Petra "Pat" Alves.  After their mother died, Alves remained in the casita.  In September 2009, Lucio had not seen William since Lucio had gone on a trip to Arizona over a month before.  Although Lucio had stopped by several times, he did not approach the house because the gate was locked and the dogs were loose.  In Lucio's experience, the dogs were vicious.  Lucio assumed that William and Clara had gone on vacation.  Lucio identified a gun recovered from Kenya and Jose Sierra (*identified below*) as one that had belonged to William, who had sometimes lent it to Lucio for hunting trips.

Pat Alves testified that when Petitioner moved in, he was introduced as Clara's cousin, but after observing his interaction with Clara for a month or so, Alves was suspicious of their relationship.  Alves recalled that Clara always sat and stood very close to Petitioner and that Clara and Petitioner touched each other affectionately.  She kept her suspicions to herself to avoid hurting her brother.

Alves testified that her mother had lived in the casita for about fifteen years before Alves moved in.  Alves lived there nine or ten years until about six months after her mother passed away.  Clara approached Alves and requested that Alves leave the house so Petitioner could live there. When Alves spoke with William, he told her that she did not have to leave but was

welcome to stay until either he or she died.  Clara was upset that Alves stayed.  Two or three weeks later, the casita burned down.

Detective Corey Gibson testified that on September 30, 2009, he was called to investigate a possible double homicide at 440 E. Mission Ave. in an unincorporated area of Merced.  As is typical of a major crime, the entire investigations division was called to the scene.  Gibson walked through the scene with the lead investigator, Detective Hale.  Gibson also observed the overturned recliner, missing television, and "a lot of insect activity."  Gibson photographed the entire scene to preserve its appearance before the search.  Gibson reviewed a series of the photographs at trial, explaining the layout of the residence, showing the jury the placement of evidence such as medication bottles, and describing the condition of the premises, such as the emptied portion of the entertainment center, emptied closet, open gun cabinet, and pulled-out drawers.

On cross-examination, Gibson testified that except for some tracking in the adjacent kitchen, he observed no apparent signs of blood in any portion of the house other than the room in which the bodies were located.  Although the television was missing from the entertainment center, other electronic devices, such as a DVD player, remained.  A shotgun remained in the gun cabinet.  Cash was found in William's wallet; Clara's jewelry was still on her body.

After securing a search warrant, Merced County Sheriffs Detectives searched the home for evidence.  Detectives observed that various valuables, such as televisions, were obviously missing.  Drawers were pulled out, and closets had been ransacked.  Deputy Harris, a licensed emergency medical technician, found a glucometer, a device commonly used by diabetics to monitor their blood sugar.  The glucometer had been used to test blood sugar three times daily until August 29, 2009, when it was last used at 8:33 a.m. for a morning test.

//

4

The searchers also sought indicia (documents and other records) that might lead to identification of the victims or residents of the property.  For example, the mailbox contained mail addressed to various individuals including William Cisneros, William and Clara Cisneros, Clara Cisneros, Clara Salazar, Julio Guevara (Petitioner), and Petra Alves (William Cisneros' sister).  The mail was later found to include a lender's repossession notice for the Cisneros' jeep, which had been recovered and impounded in Ontario, California.  Although deputies found indicia of Petitioner such as documents and prescription medications, most of his belongings were missing.

As the detectives searched the premises, Merced County Forensic Pathologist Ann Bucholtz inspected the bodies in place and supervised their removal from the premises to the morgue.  At trial, she opined that the unusual position of the bodies and the manner in which Clara had been covered indicated that the victims had not just fallen there but had been positioned at that location.

On October 1, 2009, Dr.  Bucholtz performed autopsies on the victims.  Both bodies were in an advanced stage of decomposition and showed evidence of insect activity.  After examining the bodies and damage to their clothing, Dr. Bucholtz concluded that each victim had died of stab wounds to the chest and right side of the back.  William's aorta had been severed.  Clara also had a gaping stab wound to her left neck.  The bodies were too decomposed for the doctor to determine the type of weapon used to stab the victims.  The doctor concluded that each death was a homicide.  A wallet found in the pocket of jeans recovered under the bodies contained cash and documentation belonging to William Cisneros.  To identify the victims, Dr. Bucholtz removed their mandibles for examination by a forensic dentist and forwarded thumbprints to the California state crime lab.  Dr. Bucholtz also removed and preserved rib bones bearing scratches or chips that indicated stabbing.

5

From medication containers recovered in the search of the house, a local pharmacist confirmed prescriptions issued to Petitioner and provided deputies with the numbers of Petitioner's cell phones and his California driver's license. Using this information, Deputies were able to secure Petitioner's drivers license photograph and to determine that the cell phone had last been used in Victorville, California, on August 31, 2009.

According to bank records, on August 25, 2009, $3,500 had been transferred from Clara's savings account to a joint account belonging to Clara and Petitioner.  Transactions were made in the joint account in the Merced area on August 29 and in Southern California between September 2 and September 9.  In particular, detectives discovered a September 9, 2009, debit card transaction in the amount of $353.55 at Stater Brothers Market, a grocery store in Corona, California.  Video records from the store's security cameras revealed Petitioner and an unidentified Hispanic woman, later identified as Petitioner's niece, Kenya Sierra, entering the store, shopping, and checking out.  Petitioner and Sierra wore hats and sunglasses inside the store.

Family members told police that the one of the Cisneros' vehicles, a 2002 Jeep Cherokee, was missing from the property.  A records search revealed that the jeep had been abandoned in Ontario, California, and the Ontario Police Department had stored it at a private facility in accordance with California Vehicle Code 202661(k).  After being contacted by the Merced County Sheriffs Department, the Ontario Police Department took possession of the jeep and held it as evidence.  A Merced County detective towed the jeep to the Department of Justice crime lab on October 8, 2009.

After crime lab technicians processed the jeep, Detective Gibson photographed it and inventoried its contents.  Among items inside the vehicle were empty Red Bull and Gatorade containers, and a container of spoiled carnitas.  Gibson used the vehicle identification number to confirm that the jeep had been registered to William Cisneros or Maria Clara Gutierrez, 440 E.

6

Mission Avenue, Merced.

On October 6, 2009, Detective Clark executed a second search warrant at 440 E. Mission Avenue to search for the murder weapon and to permit DOJ Criminalist Elizabeth Schreiber to process the scene for blood evidence.  Schreiber found no evidence of blood spatter.  Schreiber opined that much of what detectives had thought to be blood spatter was either evidence of insects or cooking stains.  Outside of the mudroom in which the bodies were found, Schreiber found only a few incidental blood drops, which she opined were not connected with the murders.[4]  At trial, Schreiber rejected the idea that blood could have been cleaned up in the kitchen, explaining that even though complete clean-up is theoretically possible, in her experience, perpetrators are unable to clean up blood spatter sufficiently to remove all evidence of its presence.[5]

On October 7, 2009, Clark executed a third search warrant to recover clothing and a mop head from the washer and dryer at 440 E. Mission Avenue.  Clark also recovered a disc of photographs.

On October 7, 2009, Detectives Hale, Goins, and Barba[6] travelled to Victorville, where they were joined by a deputy from the San Bernardino County Sheriffs Department.  Barba spoke with Jose and Kenya Sierra in their Victorville home.  Jose told Barba that a few weeks earlier, Kenya and Petitioner's sister and brother-in-law, Lidia and John Garcia, had picked Petitioner up from a location unknown to Jose.  Before that day, Jose and Kenya had not heard from Petitioner since Petitioner had telephoned the Sierras from Mexico, five or six years earlier, to say he had married a woman who had promised him $500,000.  After Petitioner stayed briefly with the

---

[4] For example, technicians found a small blood droplet on the refrigerator near to where first aid supplies were stored.
[5] Outside the presence of the jury, Schreiber responded to the judge's questions concerning the condition of the kitchen by stating that there was no evidence that clean-up of any type had occurred in the kitchen after the murders and that the kitchen was "filthy."
[6] Barba, a designated bilingual officer, was able to speak to the Sierras and Lidia Garcia in Spanish. John Garcia spoke English.

Sierras and the Garcias, Lidia had arranged for Petitioner to travel to Louisiana.  Petitioner had left various items with the Sierras, including a 30-06 caliber rifle, two television sets, and a hat.

Kenya told Barba that she, Lidia, and John had picked up Petitioner and his belongings near the freeway in Ontario, California, where his grey SUV, possibly a Jeep, had broken down.  Petitioner was depressed and looked sick.  Petitioner had stayed a few days with the Sierras and few days with the Garcias.  He took Kenya grocery shopping and went to the bank to withdraw money.  When he left, he gave Kenya his bank card, which she had hidden in a flower pot in the bathroom.

Jose testified at trial that Petitioner told Jose that Petitioner had married a woman who had promised that she would sell property and give Petitioner a $1.5 million share of the proceeds.  Kenya testified that Petitioner told her that he had married a woman who held him captive, did not let him use the phone, and kept him as a sex slave.  She identified Petitioner in a series of cell phone and other photographs and videos taken at 440 East Mission Avenue that showed, among other things, Petitioner sleeping, posing with something on his head, playing with a puppy, and sitting in a portable home spa.  Kenya testified that she had accompanied Petitioner to Staters Market to shop and to multiple automatic teller machines to withdraw cash.

Petitioner told Kenya that he was kidnapped by the woman he had married.  The woman held Petitioner prisoner in a home in which she lived with an older gentleman and forced him to harvest marijuana plants.  The woman would not let him leave the house where he was held or make any telephone calls.  To escape, Petitioner had "hurt" the woman when the gentleman was not at home.

Lidia told Barba that Petitioner had been there but had returned to Mexico.  When she began to provide information inconsistent with that provided by the Sierras, the detectives believed that she was not being truthful.  At trial, Lidia testified that after Barba first spoke

8

English and then spoke Spanish that she did not understand, she was not open with him because she did not trust that he was actually a law enforcement officer.

When John returned home, he disclosed that Petitioner had been in Victorville for about two weeks before departing about two weeks earlier.  Because they had not seen Petitioner in six or seven years, the visit seemed like a family reunion.  Petitioner left various articles at the Garcia home, including two suitcases; a camcorder with videotapes of William, Clara, and Petitioner; photo CDs; and five cell phones and chargers, at least one of which had photographs taken at 440 E. Mission Avenue.  After John encouraged Lidia to tell the truth, she provided the address of Petitioner's destination—the home of his sister Maria Luisa Sorto in Kenner, Louisiana.

On October 8, 2009, John Garcia telephoned Detective Hale to advise him that Garcia had found a plastic bag containing documents including check registers, passports, birth and baptismal certificates, marriage certificates, and similar documents for Petitioner, Clara, and William.  The San Bernardino Sheriffs Department recovered the documents as well as a vacuum cleaner that Petitioner had left at the Garcia home, and transferred them to the Merced County Sheriffs Department.

Lidia testified that she purchased a new cell phone for Petitioner during his visit because Petitioner's cell phone battery had gone dead and he did not have a charger for it.  Lidia denied that Petitioner had asked for air fare to Mexico, adding that Petitioner did not even know where his passport was.  She added that Petitioner travelled to their sister's home in Louisiana because there was no work in California.  After Petitioner left, Lidia found the passport trapped between two suits Petitioner had left hanging in the closet.

Lidia testified that Petitioner was a good man.  When he had disappeared after her visit to Veracruz in 2005, she had travelled to Mexico to look for him.  Although Petitioner told her that he had been kidnapped, he never told her that he had been married to Clara.

On October 21, 2009, Detectives Hale and Goins travelled to Louisiana to take custody of Petitioner.  Early in the morning of October 23, 2009, Hale and Goins escorted Petitioner on a flight from Louisiana to Houston, Texas, and on to San Jose, California, where they were met by Detective Jacklitsch, who drove them to the Merced County Sheriffs Department.

Testifying for the defense, Hale recalled that he had picked up Petitioner from the jail at five or six o'clock in the morning and drove directly to the airport.  Checking in was a slow process since Petitioner was in custody and the detectives were armed.  Although neither Hale nor Goins spoke Spanish, they communicated with Petitioner using sign language and simple words.  At the Louisiana airport, Petitioner declined food, saying "enferma" and indicating his stomach.  During a layover in Dallas, Petitioner ate a hamburger, orange juice, and possibly French fries.  Because Petitioner was released from the jail wearing only a t-shirt, Hale gave Petitioner a sweatshirt from Hale's bag.  When Petitioner returned the sweatshirt to Hale in Merced, the inside was soiled with feces.  Hale did not know whether Petitioner's body was also soiled.  Detectives began taking Petitioner's statement upon their arrival in Merced.

**B.     Petitioner's Statement[7]**

Detectives Barba and Hale[8] interviewed Petitioner upon his return to Merced County.  Petitioner told the officers that he had met Clara in Guadalajara, Mexico, in 2005, when she was visiting her sisters, who lived next door to Petitioner.  Petitioner was a market salesman who traveled to a number of Mexican cities, and owned a restaurant and several rental properties.  He had a 25-year relationship with a woman with whom he shared four sons, three of whom were adults.  Petitioner and Clara were mutually attracted and became lovers.  Petitioner told officers that Clara "stuck to him like gum."  After Clara had made several trips to Guadalajara from the

---

[7] This section reflects that portion of the statement that the state court determined to be admissible at trial.
[8] Barba questioned Petitioner in Spanish.  Hale did not speak Spanish and relied upon Barba's explanations of Petitioner's response.  A transcript, setting forth both the Spanish proceedings and their translation, was provided at trial.

United States, she and Petitioner were married in civil and religious ceremonies in Mexico in 2006.  Petitioner did not know that Clara was already married to William.

Following their marriage, Clara brought Petitioner to the United States illegally. Although they first stayed at a "crappy" motel, Clara then moved Petitioner to the home of her "ex-husband," William, at 440 E. Mission Avenue.  Clara told Petitioner that they needed to care for William, who was gravely ill, and to help with the house and yard work.  Clara introduced Petitioner as her cousin.

Petitioner, Clara, and William left the house each day to conduct William's landscaping business.[9]  When they returned each evening, Petitioner was confined to the home, where he was not allowed to watch television, listen to the radio, use the telephone, or consume alcoholic beverages.  Clara had 17 large, vicious dogs which she left loose in the yard to prevent his escape. Petitioner was forbidden to approach them, lest they learn his scent and become used to him. Each night, Clara gave Petitioner a cup of tea containing a drug that made him sleep.  When officers told Petitioner that they had seen videos of him dancing with Clara and drinking beer, Petitioner explained that had occurred only at Christmas time.

The living conditions made Petitioner want to hang himself.  Petitioner missed his sons, since he was unable to telephone them.  He decided to leave only when he saw the "big mess," that is, blood near the kitchen, and William's and Clara's dead bodies.

When Detectives Hale and Barba confronted Petitioner with the evidence that had accumulated and warned him that evidence does not lie, Petitioner changed his story.  According to Petitioner, on Saturday morning, William left the house at about 8:30 a.m. to get food.  Upon his return, William began to argue with Clara and eventually grabbed a kitchen knife.  Although

---

[9] William, a retired groundskeeper for the Merced Schools, had his own landscaping business.  As he aged and developed diabetes and heart problems, he became unable to perform the landscaping work alone.  Eventually, only Petitioner and Clara would work providing landscaping services to William's customers.

Petitioner attempted to stop the fight, William stabbed Clara and then came after Petitioner. When William tried to stab Petitioner, Petitioner was able to deflect the blow, disarm William, and stab William once in the chest, allowing Petitioner to escape.  William pulled the knife out of his chest and continued to pursue Petitioner, who ran outside, where he remained for about 20 minutes.  When Petitioner returned, William was staggering, tripped over Clara's body, and sat down on the floor.  Believing that William was still threatening him, Petitioner then killed William.  Crazy and shaking, Petitioner cleaned up the blood and fled with his clothing.

When the detectives' asked what else Petitioner took with him, Petitioner initially claimed that he took nothing else.  After being confronted with evidence of the missing television sets, rifle, and other items recovered in Victorville, Petitioner first admitted taking only one television, then later admitted he took both.  Petitioner asserted that he did not intentionally take William's and Clara's documents, claiming he just grabbed packages he thought were his papers.

When questioning resumed after a break, Petitioner was crying and claimed that he would have killed himself if he only had the means.  His sons had looked everywhere for him without success.  His mother wanted to say goodbye to him but did not know where he was.  His mother dreamed that Petitioner was dead.

Petitioner denied removing William's jeans, explaining that William generally just wore shorts around the house.  He told detectives that William and Clara were arguing about money, as they often did, changing and embellishing his account several times.  Petitioner said William had put Clara's body in the boiler room after he killed her.

The detectives indicated that the evidence suggested that Petitioner had killed Clara after an argument.  Petitioner denied this, instead telling the detectives that Clara would force him to have sex with her, tying him up and masturbating against his leg if he would not participate.

//

12

C.     **Petitioner's Testimony**

Petitioner's trial testimony was protracted and unresponsive.  He frequently sought to misdirect the questioner, whether the prosecutor or the defense attorney, by speaking of something other than the question then at issue.  Responses are frequently garbled, but whether the confusion was intentional or the result of translating the responses from Spanish to English is not apparent from the record.

Petitioner, 55 years old at the time of trial, was born in Michoacan, Mexico, and raised in the Port of Veracruz.  He sold men's clothing and imported merchandise, buying his merchandise in bulk and selling it in various cities throughout Mexico.  He owned a bar and restaurant in Veracruz.  Petitioner had four sons.  When he left Mexico in 2005, the oldest was 28 and the youngest was 13 years old.

Petitioner met Clara while using a friend's apartment in Guadalajara.  Clara was visiting her sisters, who lived next door, and they began flirting with each other, then going out.  Petitioner fell in love with Clara.  When he traveled to Veracruz to visit his children, Clara followed.  Petitioner identified multiple photographs of himself and Clara in various locations in Mexico.  Eventually, Petitioner and Clara married.  Because Clara wanted a big church wedding, Petitioner was baptized and confirmed so that the priest would marry them.

At Clara's insistence, they traveled to the United States.  After crossing the border at Tijuana, they stayed at a hotel.  Although Petitioner intended to find work first, Clara insisted that they look for an apartment.  After about a week, Clara announced that they would go live where she used to work with her ex-husband.  William and Clara came to get Petitioner at night and took him to 440 East Mission Avenue.  After Clara introduced Petitioner as her cousin, he was given the middle bedroom and Clara went to sleep with William in the master bedroom.

The next morning, Clara told Petitioner that William would give Petitioner work because

13

he could no longer do the job.  William would teach Petitioner how to mow lawns and prune trees, and she and Petitioner would take care of William.  Petitioner testified that he had no relevant experience, lifting his hand to show the remnant of the finger he cut off while sharpening a lawn mower.  Petitioner took over the business and decided that it was "OK for now."  William remained the boss.  As time past, the number of customers began to dwindle, and Clara and Petitioner began to work shorter days.

Petitioner grew to like William, finding him "very noble."  Petitioner was surprised to learn, however, that William and Clara were still married.  When Petitioner confronted Clara, she told him to wait, that William was older, and "it would be our future."  So Petitioner stayed, and found himself working the landscaping business, cooking the meals, keeping the garden, and giving William his medications and insulin shots.  Petitioner also cut William's and Clara's hair.

The three of them spent time together and vacationed together.  They played cards together after supper each evening while William told bad jokes and stories about his life. William and Petitioner played horseshoes while Clara sat in the shade.  A video shown at trial showed them exchanging gifts.  Another video showed Petitioner dancing at Christmas while Clara photographed him and William watched from a table.  A third video showed Clara dancing. Petitioner recalled that Clara loved to dance but out of respect, waited until William had gone to bed. William gave Petitioner his guns, saying that William did not intend to hunt anymore.  "We were always together," said Petitioner.  "We were like the three musketeers."

Not wanting to hurt William, Petitioner never told William of Petitioner's relationship with Clara.  When William would go out, Petitioner and Clara would have their "happy time."  In addition to sexual relations, Petitioner and Clara played together and took pictures of each other. Clara bought Petitioner a small, portable sauna, which he used in the living room.

On Saturday, August 29, 2009, Petitioner slept until 9:00 a.m., later than usual, because

14

he, William, and Clara had returned from Monterey late the night before.  William had awakened earlier and gone out to buy food, as he usually did on Saturdays.  Clara came to Petitioner's bed to awaken him.  As they lay in bed, Clara heard William enter the house, jumped up and ran to the bathroom with her clothing.  She left her bra on Petitioner's bed.  Because the dogs always barked when William returned, William had never surprised Petitioner and Clara before that morning, but Clara had put the dogs into their pen that day.  Petitioner thought that William saw Clara naked because he began yelling at her.  When Petitioner came out, William and Clara were arguing loudly in Spanish, shouting profanities. Clara had already dressed, and William had taken off the pants he had worn to go shopping and was wearing shorts. Clara pushed Petitioner and told to him to go to his room and let her take care of things.  Petitioner pushed her back before he returned to his bedroom and listened to his radio to drown out the noise.

After a while, Petitioner turned off the radio and all was quiet.  He left his bedroom and headed to the kitchen, where he saw Clara lying in the boiler room with her feet toward the kitchen.  Because she was still and there was a lot of blood, Petitioner knew she was dead.  Then William said, "Dog," and came at Petitioner, holding a long knife used for fileting fish that William had taken with him to Monterey.  They struggled in the kitchen, and William tried to stab Petitioner with the knife.  Petitioner ran outside, pushing over the living room chair as he fled. Petitioner was barefoot, wearing only the shorts he had slept in.

Outside, Petitioner cried and thought.  Eventually, he reentered the house through the living room door.  William, who was in the kitchen, had covered Clara.  Petitioner went through the bathroom toward the bedrooms and William followed.  William said, "It's just you, dog, that's left."  William and Petitioner struggled with the knife in the kitchen.  When Petitioner fled into the boiler room, William tripped over Clara's feet, and Petitioner "injured William badly."

Crazy, Petitioner cried and "wanted to die."  He began to take things—his clothing and

15

jewelry, documents, the televisions that he and Clara had bought, and the guns—and pile them into the car.  Not sure where he would go, he called his niece in Victorville because he had left his guitar there.  His niece, Kenya, was not at home, and Petitioner spoke with Jose.  Because of his high blood pressure and diabetes, Petitioner was nervous and could not think.  He fled the ranch, then realized that he was headed the opposite way from Victorville and was travelling toward Atwater.  He turned around.  Eventually, the car broke down and Petitioner got off the freeway, perhaps in Riverside.  Kenya, Lidia, and John came to get him.  They loaded Petitioner's belongings into Jose's van and left the car for the insurance company to pick up.

In Victorville, Petitioner was sick.  He heard the wind, could not sleep, had no appetite, and coughed.  Petitioner thought he was dying but his relatives took him to a doctor who said he was having a nervous crisis.

The first week, Petitioner stayed with Kenya and Jose because Lidia was in Colorado.  He went shopping with Kenya and withdrew a little money from his joint account.  Petitioner spent the second week with Lidia before going to Louisiana.  He did not want to return to Mexico because he was embarrassed at having lost everything.  He intended to earn some money in Louisiana before returning home to Guadalajara or Veracruz.  Petitioner left his belongings in Victorville so that his relatives could ship them to Petitioner after he returned to Mexico.

Police officers arrested Petitioner in Louisiana while he was mowing his sister's lawn.  The jail was very ugly and filled with drunks.  After a week there, Petitioner stunk.  He was not given his medications.  When Hale took Petitioner from the jail, Petitioner was sick.  Hale was kind and gave Petitioner a sweater.  While travelling home, Hale offered Petitioner food, but Petitioner did not feel well.  Because of his diabetes, he "passed gas and had an accident."  Although Petitioner attempted to clean himself up in the restroom, he smelled bad and was embarrassed.

16

After arriving in San Jose, Petitioner was taken directly to the sheriffs department where he was questioned. He had no opportunity to bathe and was smelly. He did not know if it was necessary to have an attorney. Petitioner did not know American law and expected to be tortured as he would have been by Mexican police. Petitioner was embarrassed by his situation and everything that had happened to him "at his old age." He told detectives that he had been kidnapped. His answers were inaccurate because he was sick and afraid.

On cross-examination, Petitioner reiterated that William was a wonderful person and like a father to Petitioner. Petitioner and William took care of each other. Petitioner felt bad when he had sex with Clara, but Clara "was also my wife." Petitioner and Clara "were like lovers," and took care to be discreet so that William would not be hurt. Petitioner loved Clara "very much." "But I had been duped and then I just became more attracted." Clara "liked all the fantasies." Petitioner admitted that he told Kenya that he was a sex slave and testified, "[I]t was with my consent."

Petitioner wanted to return to Mexico and to take Clara with him, but Clara told him that when William died, everything would be hers and then they could return to Guadalajara to live. Clara promised him that after William died, she would share her money so that Petitioner could have a store and not need to travel. Petitioner testified that before meeting Clara, he had been successful, making $200-300 per day in Guadalajara. He chose to stay in Merced because he loved Clara. Petitioner denied that he stayed because Clara would get the money, explaining that Clara "would [inherit] that ranch. It's not that she was going to receive money."

Petitioner acknowledged he had left his four children in Mexico but contended he "left a home for each one of them." When he and Clara married in Guadalajara, her family attended but Petitioner's family did not. One of Petitioner's sons was supposed to come, but he did not do so. Petitioner's family knew that he had married Clara but did not know where he was.

Petitioner had always traveled for work so his family simply expected him to telephone from time to time.  He stopped calling them in Guadalajara because Clara was jealous.  When he was in Merced, Clara would tell him not to call because if his family knew where Petitioner was, they might come.  If Petitioner presented Clara as his wife, how would they explain that to William?  Petitioner and Clara agreed that his children should not know where he was and come looking for him.  Petitioner testified that he "lost his head" and did not see his sons because of his love for Clara.  The choice was his own.

Petitioner admitted that much of his statement to detectives was false but explained that he was sick when he was questioned.  He knew Clara was married from the first week he was in Merced.  He never had to work until after dark.  Clara gave him pills to help him sleep but she did not drug him.  Clara and Petitioner opened a joint bank account, and Petitioner had money in Mexico from vehicles that he sold before moving to Merced.  He told the Sierras and the Garcias that he wanted to return to Mexico but he was ashamed to return there since he and Clara had spent all the money that had been in Petitioner's Mexican account.

Petitioner admitted that he stabbed William to death in the boiler room but maintained it was Petitioner's life or William's life.  He also admitted that he got away after stabbing William once during the struggle but returned after being outside to stab William many times.  He denied stabbing Clara.  Petitioner denied arranging the bodies in the manner in which they were found. He took the items from the house so that he could sell them to finance his escape.  He took the carnitas that William had purchased that morning from the sink to eat during his escape but could not taste them.  Petitioner insisted that he had cleaned blood in the kitchen but added that "I was so nervous I didn't know what to do."  He did not remember how much blood was in the kitchen. He denied that he did not return to Mexico for fear of being arrested at the border.  Petitioner admitted that he had the charger for his cell phone but that he had Lidia get him a new cell phone

18

so that he would have a new phone number.

## II. **Procedural Background**

On October 28, 2009, the District Attorney of Merced County, California, filed a criminal complaint charging Petitioner with (1) first degree murder of William Cisneros (Cal. Penal Code § 187(a)); (2) first degree murder of Maria Clara Cisneros (Cal. Penal Code § 187(a)); (3) unlawful taking or driving of a vehicle without the consent of the owner, with intent to permanently or temporarily deprive the owner of possession (Cal. Vehicle Code § 10851(a)); (4) grand theft (firearms) (Cal. Penal Code § 487 (d)(2)); and (5) grand theft (cargo) (Cal. Penal Code § 487 (a). Enhancement of counts one and two charged Petitioner with personal use of a deadly or dangerous weapon (knife) (Cal. Penal Code § 12022(b)).

Petitioner was tried in Merced County Superior Court in January and February, 2011. At the close of the Government's case, count five was withdrawn for lack of valuation evidence. On February 10, 2011, the jury found Petitioner guilty of the first degree murder of William Cisneros (count 1) and the second degree murder of Maria Clara Cisneros (count 2), and found the aggravating factor (personal use of a deadly or dangerous weapon) to be true for each count. The jury also found Petitioner guilty of count 3 (unlawful taking of a vehicle) and count 4 (grand theft, firearm). On March 28, 2011, the Court sentenced Petitioner to consecutive terms of 25 years to life with the possibility of parole on Count 1, 15 years to life with the possibility of parole on count 2, and 2 years on count 3. An additional two-year sentence on count 4 was to be served concurrently.

Petitioner filed a direct appeal to the California Court of Appeal. The court affirmed the conviction on September 25, 2012. On January 3, 2014, the California Supreme Court denied the petition for review without prejudice pending resolution of the pending case of *People v. Bryant* (S196365).

On December 30, 2013, Petitioner mailed a petition for writ of habeas corpus to the California Superior Court for the County of Merced.  When 60 days had passed without a ruling, petitioner moved the court for a ruling as required by the California Rules of Court (R. 4.551(a)(3)(A)).  The Superior Court never ruled on the petition.  On May 29, 2014, Petitioner filed a motion to compel a ruling in the California Court of Appeal.  On June 4, 2014, the Court declined to consider the motion since no appeal or petition had been filed in the appellate court.

On June 30, 2014, Petitioner filed a petition for habeas corpus in the California Supreme Court.   The Supreme Court summarily denied the petition on September 17, 2014.

On October 24, 2013, Petitioner filed a habeas petition in this Court.  On November 3, 2014, Petitioner filed the first amended petition that is the subject of these findings and recommendations.

### III.   Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

20

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

21

on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

## IV. Grounds 1 and 2: *Miranda* Claims

As his first two grounds for habeas relief, Petitioner contends that his rights were violated when his October 23, 2009, statement to Barba and Hale was admitted into evidence despite having been taken after Petitioner's request for an attorney. Respondent counters that in light of the circumstances set forth in the record as a whole, the state court reasonably determined that that Petitioner did not invoke his right to counsel but sought guidance regarding the advisability of securing counsel.

### A. Petitioner's Request for Counsel

As described in the factual background above, Petitioner's statement was taken immediately upon his return to Merced from Louisiana. The interview was recorded on both audio and videotape. The transcript (2CT281-400, Lodged Doc. 7) includes the English translation of the Spanish portions of the interview. Hale disputed the DVD time stamp, 2:52 a.m., testifying that the interview took place between mid-afternoon and early evening.

Initially, Barba chatted with Petitioner briefly while Hale prepared and turned on the recording equipment. Barba testified that, in accordance with his training, he always spoke casually with the suspect to establish a positive interaction and rapport before proceeding with formal questioning. The initial conversation did not address the substance of the underlying case. In this case, Barba talked about Petitioner's residence in several Central American countries where Petitioner's mother lived, and Petitioner's opinion of Louisiana. Barba disclosed that he had spoken with various members of Petitioner's family and assured Petitioner

that his family members were well.  As the conversation proceeded, Hale suggested in English to Barba that he "give [Petitioner] your preopening speech about how we work and what honesty does and what we expect, and that way nothing is off guard."[10]  Barba proceeded in Spanish; the translated portions of the transcript are indicated by italics:

> Barba: *Look, right now, we only have one side of the story that they're telling us, okay?  So we don't know your side of the story.  This is why there was an arrest warrant for your arrest, because we don't know your side of the story, you understand?  So if we don't know, we can't talk, you understand?  So this is why we are here ah, and that's why-why we have to do things this way, you understand?*
>
> Petitioner:     Um.
>
> B:     *That's why you were arrested over there . . . just because you have been arrested, no . . . well, it doesn't mean that they found you guilty, you understand?*
>
> P:     *Because I don't know anything about what they told me over there.*
>
> B:     Okay.
>
> P:     *What I know is that I was there . . . . .*
>
> B:     *No, wait-wait . . . . .*
>
> P:     *. . . I was . . . . .*
>
> B:     *Wait, do you understand what I'm saying to you?*
>
> P:     *Yes.*
>
> B:     *So, you said ah, that you want to talk.  You were asking me questions about what happened in Victorville, and about your sister and all of that.  So, we can talk about all of that too, okay?  But we are going to ask you some questions, okay?*
>
> [to Hale]  Right now he is under arrest for homicide, right?
>
> Hale:  Right.
>
> B:     *Okay, right now you are under arrest for double homicide, okay?  Everyone in the United States has rights, okay?  I'm going to read you your rights.*

---

[10] Hale did not speak Spanish, and Petitioner did not speak English.  Throughout the interview, Barba explained Petitioner's responses to Hale, and the detectives discussed in English how the questioning would proceed.

*You have the right to remain silent. Anything you say can be used against you in court. You have the right to have an attorney present, if you cannot afford an attorney, the County will pay for an attorney to represent you, before I ask you any questions, you understand?*

P:     (Unintelligible) *I need an attorney so that . . .*

B:     *And then . . .*

P:     *. . . but I don't have any money.*

B:     *No, that's why I'm telling you, if you don't have the money to hire an attorney, then the county will give-give you an attorney, because over here, everyone has the right. It doesn't matter if you don't have any money, the County of Merced will give you an attorney. You are going to get an attorney if you want one. But, do you want to explain to us what happened, and everything that has happened since you came over here and you married that woman?*

P:     *No, I met that woman in Mexico.*

B:     *Okay. But do you want to talk to us, and explain to us how things happened?*

P:     *No, no, nothing had happened, what happened was . . .*

B.     *No, that's why I'm telling you.*

P:     *. . . All I can remember is that they had me there locked in.*

B:     *Okay. That's why you want to explain all of that to us so we can talk right, an[d] we can understand each other, because right now, we don't know . . .*

P:     *Well, yes.*

B:     *. . . you understand? We have evidence.*

P:     *Well, I didn't do anything.*

B:     *Okay-okay.*

P:     *All I know is that I met her in Mexico and-and-and . . .*

B:     *Wait a minute.*

He ah, I read him his rights. He says that, "He doesn't have any money for a lawyer." I explained to him again that it doesn't matter whether he has money for a lawyer or he doesn't have any money then the County is going to give him a lawyer to represent him, I'm asking him if he wants to talk to me and tell me his side of the story, and he's going into ah, and to saying that ah, "He met the woman in Mexico and that he didn't do anything." And I'm asking him again, "Well, okay, do you want to tell me what happened?"

24

1   So he's going into stuff.

2   H:   Okay.  Um, just let him keep going into stuff.

3   B:   Okay.

4   H:   And if he wants to talk to us.

5   B:   Yeah.

6   H:   Just let him.

7   1RT287-290, Lodged Doc. 7.

8   Petitioner then explained how he met Clara and ultimately came to marry her, his life in

9   Merced ("like a monastery"), and how he left when he saw the "big mess" (blood and dead

10  bodies).  Eventually, Petitioner's story began to wander, and Barba attempted to refocus

11  Petitioner.  Petitioner then related how he became caught up in the middle of an argument

12  between William and Clara, forcing Petitioner to defend himself.  After Barba challenged

13  Petitioner's story as inconsistent with the evidence, Petitioner changed his story.  When the

14  detectives attempted to elicit further details of the killing and questioned Petitioner' insistence

15  that William, not Petitioner, had stabbed Clara, Petitioner raised the question of counsel:

16  P:   *I thought you were going to get me an attorney.  Get me an*
    *attorney, because that's all I really know.  Yes it's true about him*
17  *because . . .*

18  B:   He's saying, Well, ah . . .

19  P:   *but it was self defense, too, and I left, that's what I said.*

20  B:   . . . he's saying, "I would like a lawyer, so get me a lawyer."
    But he's still talking.

21
    P:   *My life is over and everything else.  I would rather be killed.*
22
    B:   *No, we don't do things like that here, you understand?*
23  *Because things happened for a reason.*

24  1RT364, Lodged Doc. 7.

25  Petitioner began to denigrate himself, and Barba attempted to reassure him.  Petitioner

26  then began a self-pitying narrative of his life with William and Clara, in which Petitioner accused

27  them of criminal and unethical activities, including burning down the casita and lying to the

28  electric company to get a discounted handicapped rate.  Hale interrupted Barba, asking Barba to

25

inquire about the knife used to stab the victims. The transcript continues:

> B:      (unintelligible)
>
> H:      Did he (unintelligible)?
>
> P[*sic*]: No, he just said, "Well, that I could have a lawyer."  I'm just trying to clarify.
>
> B:      *Okay, look, a while ago you were telling me that you wanted you tell me this* [sic], *then I can't continue talking to you.  We can attorney right now* [sic], *but if you don't want to talk to us and . . .*
>
> P:      *But that's all I can tell you . . .*
>
> B:      No, okay . . .
>
> P:      *. . . what I'm telling you.*
>
> B:      *. . . but calm down, we have to clarify some things, that's all, because you already told us the worst.*
>
> P:      *That's all over* (unintelligible).
>
> B:      *Exactly.  Okay, but can we continue talking?  It's up to you to . . .* [Barba stammers in the Spanish] *clarify some things.*
>
> P:      *Let's see.*
>
> B:      *Okay.  Do you want to talk without your attorney present?*
>
> P:      *I don't know what you're going to ask me.  I don't have anything else to say.*
>
> B:      *Okay, the only that . . . okay . . .*
>
> P:      *What is the . . .*
>
> B:      *Do you want to talk to me?*
>
> P:      *Let's see.*
>
> B:      *Okay.  Yes or no?  Yes?*
>
> P:      *Yes.*
>
> 1RT368-70, Lodged Doc. 7.

The interview then turned to the knife used in the stabbing.  The question of an attorney or whether Petitioner wanted to speak with the detectives was not raised again.

**B.      Trial Court Decision**

After reviewing the video of the statement in conjunction with the transcript, which

1  included the English translation, the trial court conducted a hearing under California Evidence

2  Code § 402 to determine the statement's admissibility. The parties stipulated to the transcript,

3  which had been prepared by the district attorney's office.

4      Barba testified that he administered Petitioner's *Miranda* rights using the card, which set

5  forth the rights in English, but he translated them into Spanish for Petitioner. Although Barba's

6  background was Nicaraguan and Petitioner was a Mexican born in Honduras, the two men had no

7  difficulty communicating with each other.[11] Barba testified that Petitioner never specifically

8  indicated whether he wanted an attorney or wanted to speak to the detectives, but simply began

9  talking. When Petitioner later stated that he thought the detectives were going to get him an

10  attorney, Barba warned him that they could not continue speaking together if Petitioner wanted an

11  attorney. Petitioner kept talking. When Barba specifically asked Petitioner if he wanted to

12  continue talking, Petitioner's response was equivocal ("Let's see."). When Barba pushed for a

13  specific answer ("Yes or no?"), Petitioner said, "Yes," and continued talking to the detectives.

14      Detective Hale confirmed that the sheriff's officers were trained in POST classes to chat

15  with suspects to put them at ease before beginning a formal statement. While Barba chatted with

16  Petitioner, Hale prepared the audiovisual equipment to record the interview.

17      Janet Trujillo qualified as an expert witness in Spanish interpretation. She testified that

18  Spanish was spoken slightly differently in various Central American countries and Mexico, and

19  that idioms also differed in different regions of Mexico. On cross-examination, she

20  acknowledged that she had made an error, omitting the word "no" in Petitioner's statement,

21  "*Entonces necesito a un abogado. No? Para que.*" [Then I need an attorney. No? For what?]

22  In Trujillo's opinion, inserting "no" as a question in that statement represented a common usage

23  in parts of Mexico, including the regions of Jalisco, Guadalajara, Michoacan, and Guanajuato.

24  She explained:

25          A.    Well, it's not really like no as no the word no. It's really

26             more like when you say, for example, let's go get some ice cream,

---

[11] On cross-examination, Barba explained that although Mexican and Nicaraguan Spanish are the same language, verbiage and certain words differed. He characterized Mexican Spanish as using more Spanglish, that is, mixing Spanish words and English words together in everyday speech. For example, Mexican Spanish used the word "troca" for truck, derived from the English word, but other Spanish speaking countries did not use "troca."

no.   It's not like saying, no.   It's more like you're kind of reaffirming what you were asked of or something.   So in this case it can be "right" like, or to could be "of course," or it can be just like "yeah."

Q.      So the use of the word "no" isn't intended commonly to emphasize the sentence that's going before it?

A.      Yeah, it usually does.   And in this case it does.   The way it's said, the way he speaks it, the tone of voice.   The meaning behind the voice, it's kind of really pointing towards that.

1RT96-97, Lodged Doc. 10.

Following the testimony, the trial judge engaged in protracted discussion with both sides. The judge concluded that Petitioner understood that he had a right to have an attorney present during the questioning and was equivocal up until page 83 of the statement (2CT363-64, Lodged Doc. 7) when Petitioner said, "*No dice que me va a poner un abogado, póngamelo porque yo realmente es lo único que sé.*" ["I thought you said you were going to get me an attorney.  Get me an attorney, because that's all I really know."]  Accordingly, the trial judge ordered that the statement was admissible starting with the *Miranda* rights on page 8 through page 83, subject to any other objections that may apply.

## C.      Decision on Direct Review

The Court of Appeal concluded that Petitioner impliedly waived his right to counsel.  Its analysis rested largely on *Moran v. Burbine*, 475 U.S. 412, 421 (1986), which provided for a statement's admissibility only if the suspect's waiver of his *Miranda* rights was a free and deliberate choice and not the result of intimidation, coercion, or deception.  *People v. Bonilla*, 2012 WL 4359221 at *12 (Cal. App. Sept. 25, 2012) (No. F062175).  A valid waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran*, 475 U.S. at 421).  Because a valid waiver can be either express or implied, "[a] suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." *Bonilla*, 2012 WL 4359221 at *12 (quoting *People v. Cruz*, 44 Cal. 4th 636, 667-68 (2008)).  If a court determines "that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a

28

lawyer, and that he was aware of the state's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Bonilla*, 2012 WL 4359221 at *12 (quoting *Moran*, 475 U.S. at 422-23).

The court concluded that Petitioner did not invoke his right to counsel:

> The record in the present case contains no evidence of coercion, intimidation, or deception.  There is no suggestion defendant did not understand Barba's Spanish, even though they were from different countries.  Defendant was told why he was under arrest. Although Defendant was not American, Barba expressly told him that *everyone* in the United States has rights, and that he was going to read them to defendant.  The video recording shows defendant listened intently.
>
> Although Barba did not ask if defendant understood and wished to waive each right after reading it, in our view defendant's question about needing an attorney demonstrates his understanding of his rights, except with respect to the concept of having counsel appointed.   Barba immediately undertook a more detailed explanation of defendant's right in that regard, and the video shows defendant nodding affirmatively during this explanation. Defendant clearly was not afraid to ask questions; the fact that he nodded and asked nothing else demonstrates he understood he would be give an attorney if he wanted one, even if he had no money to pay for one.
>
> *Bonilla*, 2012 WL 4359221 at *13.

The court concluded that context and inflection indicated that Petitioner's question, "[Then] I need an attorney [.  No?]", was a request for advice, not a request for an attorney. Noting Petitioner's argument concerning Mexican culture and the grammatical structure that he used, the court reiterated that the record did not support a conclusion that this statement constituted a request for counsel.[12]  As a result, the trial court did not err in determining that a portion of the statement was admissible.

## D.     Waiver of *Miranda* Rights

In *Miranda*, the Supreme Court held that a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present.  384 U.S. 436. The decision formulated a warning to be given to all suspects before custodial interrogation. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).  The trial court excluded Petitioner's

---

[12] The state court also noted that Petitioner did not present his cultural and grammatical argument in the Evid. Code 402 hearing before the trial court.

1     informal conversation with Barba before Barba read Petitioner his Miranda rights, as well as the

2     statements made after Petitioner decisively invoked his right to an attorney.  Thus, as in

3     *Berghuis*, the issue here is not whether Barba provided a *Miranda* warning, but whether

4     Petitioner's response (or lack of response) constituted a waiver of those rights.

5           "An express written or oral statement of waiver of the right to remain silent or the right

6     to counsel is usually strong proof of the validity of that waiver, but is not inevitably either

7     necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373

8     (1979).  *Miranda* holds that "full comprehension of the rights to remain silent and request an

9     attorney are sufficient to dispel whatever coercion is inherent in the interrogation process."

10    *Moran*, 475 U.S. at 427.  Observing *Miranda*'s requirements is not a matter of form, but of

11    whether the defendant has knowingly and voluntarily waived his rights.  *Id.*  This question is

12    resolved based on "'the particular facts and circumstances surrounding the case, including the

13    background, experience, and conduct of the accused.'"  *Id.* at 374 (quoting *Johnson v. Zerbst*,

14    304 U.S. 458, 464 (1938)).  "A defendant's silence, coupled with a understanding of his rights

15    and a course of conduct indicating waiver," is sufficient basis to conclude that a defendant has

16    waived his rights.  *Moran*, 475 U.S. at 373.

17          If a suspect intends to invoke his *Miranda* right to counsel, he must do so

18    "unambiguously." *Berghuis*, 560 U.S. at 381 (quoting *Davis v. United States*, 512 U.S. 452,

19    459 (1994)).  "It has long been settled that the privilege generally is not self-executing and that

20    a witness who desires its protection must claim it." *Salinas v. Texas*, 133 S.Ct. 2174, 2178

21    (2013) (internal quotation marks omitted).  "If an accused makes a statement concerning the

22    right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not

23    required to end the interrogation . . . or to ask questions to clarify whether the accused wants to

24    invoke his or her *Miranda* rights.  *Id.* (quoting *Davis*, 512 U.S. at 461-62).  "[T]here is no

25    principled reason to adopt different standards for determining when an accused has invoked the

26    *Miranda* right to remain silent and the *Miranda* right to counsel." *Salinas,* 133 S.Ct. at 2178*.*

27    Accordingly, the Supreme Court concluded that "a suspect who has received and understood the

28    *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by

1  making an uncoerced statement to the police." *Moran*, 475 U.S. at 388-89.  *See also United*

2  *States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005) ("a

3  suspect may impliedly waive rights by answering an officer's questions after receiving *Miranda*

4  warnings").

5         The state court's finding that Petitioner's statement was a request for advice, not a

6  request for an attorney is neither an inaccurate nor unreasonable factual conclusion.  In the brief

7  interchange with Barba, Petitioner acknowledged his right to counsel, appeared to look for

8  confirmation from the detectives that having an attorney was advisable, and then, without

9  hesitation, launched into an account of the circumstances leading up to the murders at 440 East

10  Mission Avenue on August 30, 2009.  Barba actually stopped Petitioner's account ("*Wait a*

11  *minute.*") to discuss with Hale whether he should allow Petitioner to proceed.  If he wants to

12  talk to us, advised Hale, just let him.  Petitioner did continue to talk to the detectives until, his

13  story complete, he unequivocally requested an attorney.  Nothing in the transcript to that point

14  (page 83 of the statement) supports a finding of intimidation, coercion, or deception.

15         The state court determined "that a suspect's decision not to rely on his rights was

16  uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was

17  aware of the state's intention to use his statements to secure a conviction, the analysis is

18  complete and the waiver is valid as a matter of law."  *See Bonilla*, 2012 WL 4359221 at *12

19  (quoting *Moran*, 475 U.S. at 422-23).  The trial court appropriately determined that that

20  Petitioner's statement was admissible, in part.

21  **V.      Ground 3: Prejudicial Effect of Inconsistencies Between Petitioner's**

22  **Statement and Testimony**

23         Ground 3 concerns the inconsistency between Petitioner's statement and testimony

24  concerning the timing of Petitioner's admitted stabbing of William Cisneros.  In his statement,

25  Petitioner told the detectives that when he emerged from his bedroom following William and

26  Clara's argument, Petitioner struggled with William as William threatened Petitioner with the

27  knife, overcoming William and stabbing him once before fleeing outside for 20 to 30 minutes.

28

Petitioner then returned inside and stabbed William several more times.  According to Petitioner's testimony, however, Petitioner did not stab William before fleeing outside in response to Williams threats.  Petitioner only "injured William badly" after Petitioner returned to the house; William again threatened Petitioner with the knife, and William fell over Clara's feet and was sprawled on the floor.  Petitioner contends that admitting his statement to detectives was prejudicial since the statement was "compelling evidence of premeditation and deliberation."  Petitioner asserts, "This statement was compelling evidence of premeditation and deliberation, and it is highly unlikely that the jury would have returned a verdict of first degree murder without it."

Although the petition does not articulate a constitutional basis for ground three, Respondent assumes that Petitioner intended to argue, as he did in his direct appeal, that the *Miranda* violation addressed in grounds 1 and 2 was not harmless error.  Respondent contends that evidence of multiple severe stab wounds to William's front and back constituted "a clear attempt to kill."  The undersigned adds that, even if the trial court had excluded Petitioner's statement, Petitioner's intent to kill was established by his testimony that he stabbed William multiple times after disarming William, a frail, elderly man who had tripped and fallen to the floor.

Having concluded that admission of Petitioner's statement was not error, the California Court of Appeal did not address whether the error was harmless.  The Court need not reach this issue, either.

## VI.    Grounds Four, Five, and Six: Failure to Instruct Jury on Lesser Included Offenses

In ground four, Petitioner contends that the trial court's failure to instruct the jury on manslaughter or unintentional killing without malice on count two (killing of Clara Cisneros) violated Petitioner's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth

Amendments.  In ground five, Petitioner contends that on count two, the trial court had a *sua sponte* duty to instruct the jury on the *Garcia* theory of voluntary manslaughter[13] and on all three theories of involuntary manslaughter.  In ground six, Petitioner contends that had the jury been fully instructed on manslaughter, "the jury could readily have concluded that the prosecution failed to probe malice beyond a reasonable doubt."  Respondent counters that these grounds do not present claims cognizable in federal habeas proceedings.

"Under the law of this circuit, the failure of a trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."  *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998), *overruled on other grounds*, *Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).  *See also United States v. Rivera-Alonzo*, 584 F.3d 829, 834 n. 3 (9th Cir. 2009) ("In the context of habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases.")  Thus, the Court should not address the issues raised in grounds 4, 5, and 6.

**VII.    Grounds 7 and 8: Sufficiency of the Evidence**

In ground 7, Petitioner contends that insufficient evidence supported his conviction of the first degree murder of William Cisneros, contending that the jury should have accepted Petitioner's trial testimony that he killed William in self defense.  In ground 8, Petitioner contends that insufficient evidence supported his conviction of the second degree murder of Clara Cisneros, insisting that he loved Clara and that it was not in his financial interest to kill the woman through whom he would inherit William's estate.

**A.    State Court Determination**

Petitioner raised this issue in his petition for habeas corpus relief filed in the California Supreme Court on November 21, 2014.  The court summarily denied the petition.

---

[13] Petitioner does not provide a citation for the source of the *Garcia* theory.

**B.      Standard of Review**

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham*, 163 F.3d at 1101. It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

**C.      Statutory Provisions**

Under California law, murder is the unlawful killing of a human being with malice aforethought. Cal. Penal Code § 187(a). Penal Code § 189 defines the degrees of murder:

> All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or any other kind of willful deliberate, and premeditated killing, or which is committed in the perpetration or, or attempt to perpetrate arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.

Cal. Penal Code § 189.

"To prove the killing was "deliberate and premeditated," it shall not be necessary to prove that the defendant maturely and meaningfully reflected upon the gravity of his or her act." *Id.*

**D.      Petitioner's Lack of Credibility**

Consideration of the sufficiency of the evidence would not be complete without

1   acknowledging Petitioner's lack of credibility.  Petitioner changed his story in the course of his

2   statement to police and changed it again at trial.  His trial testimony was unresponsive and

3   rambling.  Considered as a whole, Petitioner's inconsistent multiple stories made little sense and

4   created more questions than answers about the three parties' relationships and the occurrences

5   that ended in the deaths of William and Clara.

6       The prosecution was able to impeach Petitioner's representations that he was held captive

7   and treated poorly with photographs and videos showing William, Clara, and Petitioner enjoying

8   themselves at home and on a vacation at Lake Tahoe, celebrating Christmas, cooking, eating and

9   drinking.  Multiple photographs showed Petitioner playing with the dogs that Petitioner claimed

10  were vicious and used to keep him prisoner in the house.

11      The physical evidence from the murder scene did not support various aspects of

12  Petitioner's account, particularly Petitioner's claim that William killed Clara in a rage after

13  discovering her infidelity.  Petitioner also claimed that William and Clara argued at length and

14  that Clara had rejected Petitioner's attempts to participate in the argument, pushing Petitioner

15  away so that Petitioner returned to his bedroom and listened to the radio instead of intervening

16  further.

17      Petitioner recounted that William stabbed Clara in the kitchen; however, other than a

18  single droplet thought to be unrelated to the stabbings, crime scene technicians found no traces of

19  blood there.  Petitioner stated that William fell over Clara's feet and died where he fell, but the

20  position of William's body was not consistent with Petitioner's account.  Petitioner stated that

21  William argued with and ultimately stabbed Clara after William entered the house and saw Clara

22  running naked from Petitioner's room to the bathroom, but he inconsistently stated that William

23  had changed from his pants to shorts after he returned home.

24      As a result, the jury could have reasonably rejected Petitioner's testimony as inconsistent

25  and generally not credible.  Further, Petitioner multiple accounts permitted a factfinder to choose

26  which of Petitioner's varying stories was the most or least believable or consistent with the

27  circumstantial evidence of the crime.

28      **E.**     **Second Degree Murder of Clara Cisneros**

1    In finding Petitioner guilty of Clara's murder, the jury had to have rejected Petitioner's

2    claim that William killed Clara.  To reach its conclusion, the jury had to consider the tangible

3    physical evidence in light of Petitioner's multiple and contradictory accounts of what transpired

4    on the day of the murders and in the course of his subsequent flight.  As detailed in the factual

5    background above, sufficient evidence existed for the jury to conclude that Petitioner murdered

6    Clara -- despite Petitioner's argument in his habeas petition that he loved Clara and had no motive

7    to murder her.

8    According to one of Petitioner's accounts, on the morning of the murders, William left the

9    house to get food, as was his habit on Saturday mornings.  Clara then came into Petitioner's

10   bedroom, disrobed, and got into bed with him.  On similar occasions, Clara left the dogs out in

11   the yard so that their barking would warn Petitioner and Clara to cease their amorous activities

12   because William had come home.  On the morning of the murders, however, Clara had

13   inexplicably left the dogs in their pen, resulting in William's being able to enter the house

14   unnoticed and discover a nude Clara running from Petitioner's bedroom carrying her clothing.

15   In the course of both his statement and trial testimony, Petitioner exploited his listeners'

16   curiosity about his unusual relationships with William and Clara to divert attention from specific

17   questions concerning the murders.  For example, when the detectives taking Petitioner's

18   statement suggested that he had killed Clara after a disagreement, Petitioner did not respond

19   directly but accused Clara of sexually assaulting him.  Petitioner also claimed that the relationship

20   between Petitioner and Clara had deteriorated so that Petitioner was no longer interested in sexual

21   relations with Clara.  Petitioner accused Clara of chaining him to the bed, forcing her attentions

22   on him, and masturbating against Petitioner's body if he resisted her advances.  Petitioner's

23   unresponsive claims evinced hostility toward Clara and undermined his claims of love and

24   devotion to her.

25   To the extent that Petitioner's argument for habeas relief is that his love for Clara obviates

26   the possibility of his murdering her, ample evidence, including Petitioner's own statement and

27   testimony, supported the conclusions that Petitioner harbored a variety of emotions concerning

28   Clara, many of which were negative.  Petitioner expressed anger and frustration that Clara had

1   tricked him and that they could not live openly as husband and wife.  He accused Clara of

2   kidnapping him, imprisoning him, sexually abusing him, and keeping him from his sons in

3   Mexico.  Clara had promised him varying amounts of cash but had not delivered.  Clara had

4   drained Petitioner's Mexican bank accounts.  Clara had made Petitioner, a successful

5   businessman in Mexico, work as a landscaper.  Petitioner dramatically displayed the stub of the

6   finger that was amputated when he tried to repair a lawnmower.

7           Other evidence directly implicated Petitioner in Clara's murder.  After fleeing Merced,

8   Petitioner himself told Kenya Sierra that he had hurt the woman when her husband was not at

9   home.  Dr. Bucholz, the county pathologist, opined that the bodies had similar stab wounds,

10  suggesting that one assailant had stabbed both of the victims.  Bucholz added that the victim's

11  bodies had been positioned in the boiler room.

12          The Court should not disturb the jury's conclusion that Petitioner murdered Clara.

13          **F.      First Degree Murder of William Cisneros**

14          Petitioner contends that he was wrongly convicted of first degree murder because he killed

15  William in self defense.  This Court's role is not to reconsider the range of offenses of which a

16  Petitioner could have been convicted.  In assessing a due process challenge grounded in

17  insufficient evidence, the only question before the Court is whether, after viewing the evidence as

18  a whole, in the light most favorable to the prosecution, "*any* rational trier of fact could have found

19  the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  With

20  regard to William's murder, the answer is unquestionably "yes."

21          As detailed in the factual background above, Petitioner provided three different accounts

22  in his statement and his trial testimony.  In the first account set forth in his statement to the

23  deputies, Petitioner said that he left the house after discovering the "big mess," that is, the bodies

24  of William and Clara.  In his second account, Petitioner admitted that he killed William.

25  Petitioner stated that he stabbed William once in the struggle to disarm William, then retreated

26  outside for about twenty minutes.  When Petitioner went back into the house, he discovered

27  William was still dangerous and stabbed William several more times.

28          The jury was not required to accept Petitioner's claim of self defense but was free to

37

1    determine that Petitioner intentionally stabbed William multiple times.  That conclusion was

2    consistent with Dr. Bucholz's testimony that William had been stabbed multiple times both from

3    the front and in the back.  Other evidence also supported that finding, including Petitioner's

4    gathering valuables and documents for William, Clara, and himself; returning to the kitchen to

5    take the carnitas that William had purchased that morning; packing William and Clara's jeep; and

6    fleeing to relatives in southern California and later, Louisiana.

7            The Court should not disturb the jury's convicting Petitioner of the first degree murder of

8    William Cisneros.

9        **G.**        **Summary**

10           Sufficient evidence supported the murder convictions.

11   **VIII.   Grounds Nine and Ten: Prosecutorial Misconduct--Withholding Exculpatory**
         **Evidence and Misrepresenting Autopsy Results**
12

13           As the ninth and tenth grounds for habeas relief, Petitioner alleges prosecutorial

14   misconduct arising from the prosecution's withholding autopsy photographs showing the stab

15   wounds on William's and Clara's bodies and introducing expert opinion of the number of stab

16   wounds inflicted.  Respondent correctly points out that the prosecution neither withheld evidence

17   nor mispresented the autopsy results.

18
         **A.**        **State Court Determination**
19
             Neither the ninth nor the tenth ground for habeas relief was raised in Petitioner's direct
20
     appeal.  Petitioner raised both grounds in his petition for writ of habeas corpus.  The California
21
     Supreme Court summarily rejected the habeas petition.
22

23       **B.**        **Prosecutorial Misconduct**

24           Prosecutorial misconduct is a violation of the constitutional guarantees of due process.

25   *Phillips v. Ornoski*, 673 F.3d 1168, 1188 (9th Cir. 2012).  "Unconstitutional prosecutorial

26   misconduct occurs where the prosecutor engages in actions that 'so infec[t] the trial with

27   unfairness as to make the resulting conviction a denial of due process.'"  *Id.* (quoting *Greer v.*

28
                                             38

*Miller*, 483 U.S. 756, 765 (1987)).  To constitute a due process violation, the prosecutorial

misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

fair trial."  *Greer*, 483 U.S. at 765 (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

In determining whether a prosecutor's challenged action rendered a trial fundamentally unfair, a

court must place the challenged misconduct in the context of the trial as a whole.  *Darden v.

Wainwright*, 477 U.S. 168, 179 (1986).

### C.     No Exculpatory Evidence Was Suppressed

"[S]uppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In

ground nine, Petitioner contends that the prosecution suppressed exculpatory evidence by

withholding the autopsy photographs of William and Clara Cisneros.  According to Petitioner, the

autopsy photographs would have proven that Dr. Bucholtz could not determine the number of

stab wounds inflicted on each victim and illustrated that the two stabbings were not similar and

likely not committed by the same person.

Petitioner misunderstands the term "suppression of evidence."  The record establishes that

the prosecution disclosed the autopsy photographs to the defense.  In his motion *in limine*,

Petitioner requested that "admissibility of all photographs depicting in any manner the bodies of

the decedents be addressed outside the presence of the jury and prior to any attempt to use them

as an exhibit."  1CT279.  At the hearing, the prosecutor agreed with Petitioner's motion and

indicated his intent not "to use any decomposing body stuff."  1RT35.  This means that the

prosecution did not suppress evidence pursuant to applicable case law, thereby precluding

prosecutorial misconduct.

The context of Petitioner's claim indicates that Petitioner now objects to the prosecution's

presentation of Dr. Bucholtz's expert opinion concerning the number and location of the stab wounds on each victim and whether the nature of the wounds suggested that both victims were stabbed by a single assailant.  Petitioner contends that the prosecutor should have introduced the photographs into evidence to establish that the bodies were so decomposed as to preclude a determination of the number of times each victim had been stabbed.  Although the law requires the prosecutor to disclose the photographs to the defense, it does not require the prosecution to present that exculpatory evidence in its own case.  By disclosing the exculpatory evidence to the defense, the prosecution satisfied due process by enabling the defense to determine whether to introduce that evidence in its case.  Trial counsel did not introduce any explicit autopsy photographs.

As Petitioner acknowledges in his petition, the "gory" nature of autopsy photographs frequently means that their prejudicial value outweighs their probative value.  Having laid for a month in an uncooled laundry room in the central California heat, the photographs of the victims' bodies in this case could reasonably be categorized as "gory."  Dr. Bucholz testified to their advanced state of decomposition, partial mummification, and infestation by various insects and their progeny.  Recognizing the likely prejudicial impact of the photographs, Petitioner's counsel moved, without objection from the prosecution, for exclusion of the autopsy photographs unless subjected to prior notice and review outside the presence of the jury.  As a result, even if the prosecution's failure to introduce the photographs as evidence could be interpreted to constitute "suppression," Petitioner cannot now object that the prosecution failed to introduce the photographs.

### D.      No False Evidence Was Introduced

As his tenth ground for relief, Petitioner contends that by presenting Dr. Bucholtz's testimony, the prosecution wrongfully introduced false evidence.  Petitioner argues that because

40

of the bodies' advanced decomposition and their possible partial consumption by the victims'

dogs, Dr. Bucholtz could not reliably determine the number or nature of the stab wounds.

California Evidence Code § 801 provides:

> If a witness is testifying as an expert, his testimony in the form of
> an opinion is limited to such an opinion as is:
>
> (a) Related to a subject that is sufficiently beyond common
> experience that the opinion of an expert would assist the trier of
> fact; and
>
> (b)  Based on matter (including his special knowledge, skill,
> experience, training, and education) perceived by or personally
> known to the witness or made known to him at or before the
> hearing, whether or not admissible, that is of a type that reasonably
> may be relied upon by an expert in forming an opinion upon the
> subject to which his testimony relates, unless an expert is precluded
> by law from using such matter as a basis for his opinion.

Dr. Bucholtz, the forensic pathologist for Merced County, conducted the autopsy of each

victim.  She also qualified as an expert witness based on her expert education, training, skill,

experience, and knowledge as a forensic pathologist.  To the extent that a lay person may have

looked at the victims' decomposed bodies and concluded, as Petitioner contends, that determining

the number and nature of stab wounds was impossible, Dr. Buchholtz's expert opinion assisted

the jury in its determination of the facts of the victims' deaths.  The doctor certified both victims'

causes of death as homicide (stabbing).  She testified to observing slits and gaping wounds on the

bodies consistent with the victims' having been stabbed and to examining the victims' clothing

for corresponding cuts or tears that were also indicative of stabbing.  She described the

corresponding clothing damage as she identified numerous photographs of the victim's clothing.

Dr. Bucholtz also secured and preserved rib bones from each victim evidencing damage

consistent with each victim's having been stabbed.  The doctor candidly testified that the

decomposition of the victim's internal organs prevented her from determining the likely type of

weapon or any injuries inflicted on the victim's internal organs.

On cross-examination, defense counsel sought to emphasize the limitations of Dr.

Bucholtz's opinion that resulted from the bodies' decomposition and asked questions that

required the doctor to reiterate the limitations of her analysis. Counsel also unsuccessfully sought

1   to have the doctor acknowledge that some of the injuries could be due to partial consumption by

2   the victims' dogs or skin ruptures to release the gaseous by-products of decomposition.  Redirect

3   examination led Dr. Bucholtz to describe the process of her analysis in greater detail.  At no point

4   did the defense object to Dr. Bucholtz's being qualified as a forensic pathology expert or to her

5   factual observations or opinion testimony.

6         That Petitioner disagrees with Dr. Bucholtz's opinion regarding the victims' stab wounds

7   does not mean that the prosecution presented false evidence.  The defense was able to challenge

8   Dr. Bucholtz's opinion through cross-examination and in their case in chief.  The prosecution's

9   presentation of Dr. Bucholtz's expert opinion did not constitute the presentation of false evidence

10  and does not support Petitioner's claim of prosecutorial misconduct.

11        **E.      Summary**

12        The Court should reject Petitioner's claims of prosecutorial misconduct.

13  **IX.    Ground Eleven: Deprivation of Property Without Due Process**

14        As his eleventh ground for habeas relief, Petitioner contends that the prosecution

15  confiscated property belonging to Petitioner without due process and has failed to return it.

16  Because this claim does not involve Petitioner's right to be released from custody, it is not

17  cognizable in federal habeas review.  *United States v. Kramer*, 195 F.3d 1129, 1130 (9th Cir.

18  1999).  The Court lacks jurisdiction to address this claim.

19  **X.    Ground Twelve: Ineffective Assistance of Appellate Counsel**

20        Petitioner's twelfth ground for habeas relief alleges that his appellate counsel provided

21  ineffective assistance by failing to include the issues raised in Petitioner's habeas actions in the

22  direct appeal of Petitioner's conviction.  If the Court agrees with the recommendation that it not

23  grant relief on the issues that Petitioner raised in his subsequent habeas petitions, it need not reach

24  this claim.

25  **XI.    Ground Thirteen: Appellate Counsel's Misrepresentation of Fact**

26        In his thirteenth ground for relief, Petitioner alleges that his appellate counsel prejudiced

27  the outcome of the appeal by falsely stating that Petitioner stabbed William once before leaving

28  the house for 20 to 30 minutes, then stabbed William again when he returned inside.  Relying

42

solely on his trial testimony, Petitioner contends that appellate counsel's representation was "totally false."  The argument does not acknowledge that in his statement to detectives, Petitioner said that he stabbed William once before leaving the house for 20 to 30 minutes, then stabbed William multiple times when he returned inside.  The Court should reject this ground for relief.

## XII.   Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

>> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

>> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to

proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court declines to issue a certificate of appealability.

**XIII.**   **Conclusion and Recommendation**

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **March 1, 2017**                    /s/ *Sheila K. Oberto*
                                                   UNITED STATES MAGISTRATE JUDGE

44